IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

BERNICE STRANGIS,

                       Plaintiff,                  OPINION AND ORDER

    v.

                                                  17-cv-690-wmc

ANDREW SAUL, Commissioner of
Social Security,

                       Defendant.

Plaintiff Bernice Strangis seeks judicial review of a final decision denying her application for Social Security Disability Insurance ("SSDI") and Social Security Supplemental Insurance ("SSI") Benefits under 42 U.S.C. § 405(g). On appeal, plaintiff raises four challenges: (1) the Administrative Law Judge ("ALJ") Charles J. Thorbjornsen failed to resolve an evidentiary conflict in the testimony of the vocational expert ("VE"); (2) the ALJ failed to appropriately weigh the opinions of two treating health care providers; (3) there is no medical expert or evidentiary basis for finding that Strangis could stand or walk for two hours in an eight-hour day; and (4) the ALJ improperly discredited or failed to explain his basis for rejecting Strangis's account of her limitations. For the reasons that follow, the court will reverse the Commissioner's holding and remand for further proceedings consistent with this opinion and order.

BACKGROUND[1]

A. Overview of Claimant

Strangis was born on June 23, 1955. She applied for benefits on March 26, 2015,

---

[1] The administrative record ("AR") is available at dkt. #9.

claiming an alleged onset disability date of May 21, 2014. This made Strangis 58 years-old on the alleged onset date of her disability in 2014; 59 years-old when she applied for disability in 2015; and 61 years-old at the time of her hearing in 2017. As the ALJ acknowledged in his decision, Strangis was "of advanced age" at the alleged onset date and changed to "closely approaching retirement age" during her application process. 20 C.F.R. §§ 404.1563(e), 416.963(e). (AR 27.)

Strangis has at least a high school GED education, is able to communicate in English, and has past work experience as a bartender and food products service representative. Strangis last engaged in substantial gainful activity at her alleged onset disability date in 2014, though she has worked on a very limited, part-time basis as a bartender since then. In her initial application, Strangis claimed disability based on lower back pain, right hip pain, numbness in right foot and pain in both shoulders. (AR 66.)

### B. Medical Records

#### 1. Records Predating Alleged Disability Onset Date

Before her alleged disability onset date, Strangis saw a chiropractor from May through September 2013 for shoulder and back pain, rating her pain between a two and a six on a ten-point scale and complaining that work exacerbated her symptoms. (AR 319-23.) On May 7, 2013, Strangis also saw Brian K. Konowalchuk, M.D., an occupational medicine doctor for a follow-up evaluation of chronic shoulder pain. Based on the results of an updated MRI, Dr. Konowalchuk did not recommend shoulder surgery at that time, but he encouraged her to engage in home exercise, noting her lack of compliance with the recommended exercises to date. (AR 336-37.) However, shoulder pain, does not appear

to be a basis for her appeal, which instead focuses on back pain. Next, on August 9, 2013, plaintiff saw Leah Jacobs, N.P., for sinusitis. On May 14, 2014, she saw John W. Ingalls, M.D., for fevers and chills. (AR 380-81.) The court notes these appointments to point out that Strangis's treatment relationships with the two providers were established at least by 2013 and 2014.

### 2. Pain Treatment May 2014 - November 2015

After her alleged disability onset date of May 21, 2014, Strangis continued with chiropractic care, rating her pain in her low back and shoulders as ranging between a two and an eight out of ten. (AR 316, 324-39.) In June 2014 appointments with Jacobs for allergies and pain, Jacobs noted "[s]omewhere in her history she has a diagnosis of fibromyalgia. Which she agrees with but doesn't agree with; she is contradictory throughout our visit regarding this." (AR 383-84.) Strangis also indicated that she was not interested in medication for fibromyalgia. (AR 384.)

In a June 25, 2014, appointment with Danielle K. Redburn, DPM, Strangis complained about burning and numbness in both feet for years. (AR 385-87.) Redburn recommended consultation with neurology and an EMG. (AR 452.) Consistent with that recommendation, Strangis was seen by Gurdesh Beti, M.D., on July 28, 2014, for numbness, burning and stinging pain in feet. (AR 387-89.) Dr. Beti diagnosed Strangis with small fiber neuropathy, noting that the EMG did not show any clear evidence of large fiber neuropathy. Dr. Beti recommended labs to check various levels, indicated that he suspected lumbosacral radiculopathies given low back pain, and scheduled her for an MRI. The MRI was completed on July 30, 2014, revealing "[m]ultilevel disc disease and bony

arthropathy. There is moderate degree of stenosis at L4-5 in the transverse plane, produced by facet arthropathy and ligamentous hypertrophy. The intervertebral foramina at all levels appear patent." (AR 374-75.)[2]

On September 9, 2014, Strangis returned for a follow-up appointment with Dr. Beti. (AR 400-01.) During that appointment, she reported that she could not tolerate Gabapentin, indicating that she experienced a lot of drowsiness and did not feel that there was much pain relief anyways. Strangis described her pain as starting in hips and travelling laterally toward the sides, and occasionally shooting down to her feet. She also stated that she experiences tingling in her feet. Dr. Beti suggested starting her on Cymbalta, referring her to a spine surgeon and having her touch base with Dr. Ingalls, her treating physician, to discuss the orthopedic components.

On November 17, 2014, Strangis was seen by N.P. Jacobs. (AR 404-06.) The physical examination revealed, "[l]umbar spine exam is abnormal with tenderness and pain that radiates bilaterally to the hips and upper legs. There is diminished strength. She is able to [d]o a toe raise but with pain. She is unable to raise on her heals. She walks with an antalgic gait. ROM is reduced due to significant pain. She reports numbness into her right great toe." (AR 405.)

---

[2] The MRI also noted two spleen masses, and recommended a CT scan for further evaluation. Strangis sought subsequent evaluation and treatment for the spleen masses, but this medical issue is not a focus of her disability application or this appeal. (*See* AR 375-76 (September 3, 2014 CT abdomen); AR 406-09 (November 24, 2014, appt. with Jill Ties, M.D. for abdominal pain).) The ALJ, however, did rely on a medical record from this treatment in which Strangis indicated that "She recently has traveled through the US on a road trip to Florida." (AR 406.) This was noted in the context of also noting that others around her were not ill to possibly rule out an infectious disease.

On November 26, 2014, Nayyer M. Mujteba, M.D., who specializes in physical medicine and rehabilitation, saw Strangis. (AR 338-39.) Dr. Mujteba noted that Strangis's chief complaint was low back pain, and specifically noted that "[p]ain increases with prolonged rest, as well as standing/walking and activities in general." (AR 338.) Mujteba also noted that Strangis had tried physical therapy but it did not help. Mujteba reviewed her July 2014 MRI, which revealed "significant loss of disk height at L4-L5 and L5-S1 level. There is mild disk protrusion into inferior aspect of left intervertebral foraman. She does have some mild to moderate spinal stenosis. Significant facet joint arthropathy noted as well." (AR 339.) He also reviewed a September 2014 EMG, noting that it "raised the possibility of mild chronic/resolved lumbosacral radiculopathy affecting L5 and S1 nerve roots." (AR 339.) X-rays obtained that day showed "mild degenerative changes" in her hips. (AR 339; AR 347-51 (x-rays).) His physical exam revealed "quite tender about L4-L5 and L5-S1 level. Back pain greatly increases with facet loading." (AR 339.) Mujteba's plan was to do some joint injections and have Strangis seek another neurosurgical opinion if that did not work.

On December 3, 2014, Strangis met with Obioma J. Igboko, MBBS for pain management for lumbar facet joint injections. (AR 341-43.) During that appointment, she rated her pain as 9 out of 10. Dr. Igboko noted that "[h]er pain is aggravated by any kind of activity and prolonged standing or sitting. It is relieved by rest and sometime hydrocodone, but it makes her very tired so she is not keen on opioid medications." (AR 342.) While Igboko noted that she "does appear to be in quite a bit of painful discomfort," he also stated "[h]er pain appears to be somewhat exaggerated." (AR 342.) Strangis

tolerated the injections.

On January 7, 2015, Strangis returned for a follow-up appointment with Dr. Mujteba. (AR 345-46.) She reported that she is experiencing a "great deal of low back pain, constant pain. Pain increases with minimal activities." She also reported that the injections did not provide any relief. Mujteba suggested lumbar spine epidural injections, a different type of injection than she had tried previously, but Strangis declined, instead opting for physical therapy and an assessment with the spine center.

On January 20, 2015, Strangis saw Christopher Alcala-Marquez, M.D., a spine center surgeon. (AR 362-64.) During the appointment, she indicated that she is currently taking Aleve and reported negative side effects with hydrocodone. During his examination, like Dr. Igboko, Dr. Alcala-Marquez also noted "Waldell signs for overreaction superficial pain." (AR 364.) Based on the MRI, Alcala-Marquez diagnosed Strangis with "lumbar spondylosis worse at L4-L5 and L5-S1," but determined that she was not a good surgery candidate, instead recommending that she try an interlaminar epidural steroid injection, which was administered on January 27, 2015. (AR 366-67.)[3]

On March 18, 2015, Strangis had another appointment with Dr. Alcala-Marquez. (AR 359-60.) She reported that the L4-L5 interlaminar epidural steroid injection did not provide relief but that a Medrol Dosepak (prednisone) did provide "very good relief of her back pain."[4] (AR 359.) Dr. Alcala-Marquez noted that Strangis had "almost complete

---

[3] Around this same time Strangis also sought treatment for a possible sinus infection, including appointments with treating providers N.P. Jacobs. (AR 445-46.)

[4] On February 11, 2015, Victoria Studtmann, N.P. had provided Strangis with a prednisone prescription for lower back inflammation. (AR 429-32.)

disc collapse with minimal stenosis." (AR 360.) He encouraged Strangis to continue with physical therapy, start anti-inflammatory medication, try a steroid injection, but did not recommend surgery.

In a September 1, 2015, appointment also with Jacobs, Jacobs noted that Strangis presents with pain and depression because of the pain. (AR 497.) As part of the physical examination, Jacobs noted "[s]he has 18 of 18 positive fibromyalgia tender points. She was crying in pain by the end of the evaluation." (AR 499.) Jacobs also noted that Strangis was diagnosed with fibromyalgia over two years ago by Dr. Ayub, though that specific record does not appear in Strangis's medical record as far as the court can discern. Jacobs started Strangis on Prozac to see if that would help, and while Strangis noted in a follow-up appointment with Jacobs on October 26, 2015, that it was helping with the depression (although not with the fibromyalgia (AR 517)), she ultimately could not tolerate it and was tapered off of it. (AR 521-23.)

### 3. Foot and Ankle Injuries

On February 21, 2015, Strangis was separately seen in the ER by Thomas Hinck, M.D. (AR 434-36; AR 376-78 (x-rays of foot).) Strangis had tripped over an electrical cord, fell and heard a pop. Her foot was swollen and she was diagnosed with a left foot strain. During a subsequent appointment with Dr. Redburn on February 26, 2015, Strangis was diagnosed with a Lisfranc's dislocation, which was treated conservatively with a CAM boot and crutches. (AR 437-38; AR 442-43 (Mar. 12, 2015 appointment).) In an April 1, 2015, follow-up appointment, Dr. Redburn indicated that Strangis's foot injury seems to have resolved, that she denied any weakness or numbness, she was back to

working on her feet, the swelling had resolved, and she was "doing very well."  (AR 451.)

In June 2016, Strangis also fell and broke her ankle.  (AR 586-88.)  She had surgery where hardware was placed on July 5, 2016.  (AR 636-37.)  In follow-up appointments with the surgeon, he indicated that she was doing "reasonably well."  (AR 590-93.)

### 4.  Physical Therapy Efforts

In August 2014, Strangis began physical therapy, attending on roughly a weekly basis (with some gaps in treatment) for almost two years until April 2016, with the majority of appointments with the same physical therapist Robyn M. Formanek.  (AR 390-487, 500-07, 550-62.)  The treatment notes document her level of pain during treatments, describe pain observations, including problems with gait, indicate the degree to which she tolerated various manipulations and note any progress.  Material to the present appeal, Strangis noted at her first appointment on August 20, 2014, that she doesn't like taking Gabapentin because it makes her feel "spacey."  (AR 390.)  She also indicated during that appointment, that she "[c]ould not lie in prone for more than 10 mins."  (AR 398.)  The physical therapist at times also noted Strangis's attempts to work as a bartender and the pain she experienced during and after working.  "She is working one night per week, but is struggling to perform her job as a bartender.  Standing on her feet is painful and difficult."  (AR 417 (Dec. 10, 2014 note); *see also* AR 487 (June 11, 2015 note describing pain and tightness after being on her feet, working for 6 hours).)

In addition to noting effects of working, Formanek also noted pain caused by engaging in more strenuous household activities.  Specifically, on May 15, 2015, Formanek also noted, "Patient tried to do some yard work today.  She is limping and has intense right

hip and groin pain this afternoon." (AR 482.)[5] The January 4, 2016, treatment note stated, "[p]atient was washing her floors on her hands and knees yesterday and is very tight and sore in the hips and pelvis today." (AR 519.) An April 18, 2016, note further indicated that Strangis "helped her friend cut a tree and haul some wood, she reports that she didn't lift anything heavy, but enough to aggravate her pain. She also did some raking this Saturday." (AR 556-57.) Also in April, at a PT appointment, Strangis reported that she had a job interview coming up and that she had been studying for a test. (AR 562.)

### 5. Opinions of Treating Health Care Providers

Strangis saw N.P. Jacobs again on May 19, 2015, requesting documentation for her disability application. That examination revealed tightness, pain and tenderness, although her description lacked the level of detail and the degree of limitations noted in her November 2014 appointment with Jacobs. Still, Jacobs concluded, "[i]t is my medical opinion that she is not totally disabled. She would be able to work part time with a job conducive to her condition. She absolutely could not do a job that required frequent lifting or bending and certainly no lifting over #10-15 pounds." (AR 484.)

On September 23, 2015, Strangis again saw Dr. Ingalls, requesting a functional capacity assessment for her disability application. (AR 508.) Dr. Ingalls referred her to PT to complete the form, which was apparently completed by Strangis's physical therapist Robyn M. Formanek on October 23, 2015. For reasons that are not clear, Dr. Ingalls did not sign off on this form until March 28, 2016. (AR 492-93.) Regardless of this odd

---

[5] Notably, Strangis had approximately a four-month gap in PT, apparently due to an insurance issue. (AR 520.)

timing, the form indicates that Strangis would need to lie down for an hour during an eight-hour day, and she would miss work three to four days per month.

### C. ALJ Opinion

Following an evidentiary video hearing held on January 24, 2017, at which plaintiff appeared with counsel, the ALJ found that Strangis had the following severe impairments: degenerative disc disease, bilateral hip degenerative joint disease, fibromyalgia, and a left ankle fracture. (AR 21.) While the ALJ's opinion contains little explanation for his finding of these severe impairments, he did explain his reasons for rejecting other impairments as severe either because they did not cause significant functional limitations or did not meet the durational requirement and why none of the impairments meet one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Strangis's appeal does not challenge these findings.

As for her residual functional capacity, the ALJ concluded that Strangis could perform:

> light work as defined in 20 CFR 404.1567(b) and 416.967(b)
> except: stand and walk two of eight hours; occasionally stop
> and crouch; no climbing ladders, ropes or scaffolds; no work at
> unprotected heights or by moving mechanical parts.

(AR 23.)

In formulating this RFC, the ALJ considered Strangis's testimony that she is limited in "her ability to walk more than a block at a slow pace, bear weight for six of eight hours, or sustain full time employment," as well as her representation that she is limited to lifting no more than 5-15 pounds, squatting, bending, reaching, sitting, kneeling, climbing stairs

and gripping, and that she has limited ability to "complete tasks, remember and concentrate." (AR 23.) Nonetheless, the ALJ discounted her account because of inconsistencies in the medical record and other evidence.

Specifically, the ALJ pointed to chiropractic records showing some back pain relief after treatments in late November 2014; lack of "neurogenic changes" in nerve conduction studies of her feet; reports during physical therapy that she could sit for more than 60 minutes and walk more than 100 yards; a couple of notations in the medical record about Strangis exaggerating her pain; a January 2016 record from a cardiologist that Strangis could walk one mile; and lack of use of pain medications. (AR 23-26.) Accordingly, the ALJ concluded that

> [t]he overall record above does not show that the claimant has neurological deficits or structural abnormalities that would preclude lifting and carrying at a light exertional level or to sit for sedentary exertional length of time or to tolerate occasional stooping or couching. Her gait appears generally intact. The claimant's overall presentations are notable for complaints of chronic pain with conservative care and a pattern of limited treatment for each discrete condition over a short period of time with no continued treatment of fibromyalgia or her hip pain. Her only surgery was in 2016 for a fractured knee that appears to be healing except for some hardware irritation. She takes limited pain medications.

(AR 26.)

The ALJ also concluded that Strangis's claimed limitations are inconsistent with her accounts of daily living, including a late 2014 road trip to Florida, a report in October 2015 of washing floors on hands and knees, her recounting of studying for an insurance license

in April 2016, and helping a friend with yard work at an unspecified time.[6]  (AR 26.)  The ALJ also found that her continued part-time work as a bartender, which exceeds her RFC, undermined her claimed limitations.

As for the opinions of the various health care professions, the ALJ gave the opinions of the state agency consultants "great probative weight and are essentially adopted," although he acknowledged that "more recent MRI findings and knee fracture . . . warrant additional weight bearing and hazard restrictions."  (AR 26.)  As for her treating providers, the ALJ gave only "partial weight" to Nurse Practitioner Jacobs and Dr. Ingalls.   In discounting Jacobs' opinion limiting Strangis to part-time work with additional limitations, the ALJ explained that Jacobs is "not a programmatically acceptable medical source and her evaluation that day reported as generally normal other than pain and tenderness."  (AR 27.)  As for Dr. Ingalls' opinions that Strangis can only work part-time or would need to lie down, the ALJ discounted this because "Dr. Ingalls does not provide any clinical correlation to the recommendation and that the claimant has previously reported lying down exacerbated her pain."  (AR 27.)  The ALJ also faulted Ingalls for providing "no data driven analysis" and noted that he "saw the claimant only infrequently," though he acknowledged that Ingalls "sign[ed] off on Ms. Jacob's notes."  (AR 27.)

Finally, while the ALJ found that Strangis could not perform her past relevant work, he found that she had acquired work skills from this past work, including customer service

---

[6] As described above, in an April 18, 2016, record, Strangis's physical therapist noted that she had helped a friend cut down a tree and haul the wood.  (AR 556-57.)  The ALJ, however, failed to note that the PT also stated that "she didn't lift anything heavy, but enough to aggravate her pain." (*Id*.).

skills in both prior occupations -- bartending and food products sales representative -- and had also acquired office and clerical skills and computer skills in the latter job.  (AR 28.)  Based on all of this and the VE's testimony, the ALJ determined that Strangis could perform information clerk and general officer clerks jobs, and that both jobs would utilize her customer service skills and the general office clerk would also utilize the "remaining transferrable skills identified."  (AR 28.)  As such, the ALJ concluded that Strangis was not disabled through the date of the decision.

## OPINION

The standard by which a federal court reviews a final decision by the Commissioner of Social Security is well-settled.  Findings of fact are "conclusive," so long as they are supported by "substantial evidence."  42 U.S.C. § 405(g).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).  Accordingly, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner.  *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993).  At the same time, the court must conduct a "critical review of the evidence," *id.* at 336, and insure the ALJ has provided "a logical bridge" between the evidence and his legal conclusions.  *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018).

Strangis's counsel raises several challenges (and sub-challenges), which the court takes up in turn.

## I. Evidentiary Conflict in VE Testimony

In light of Strangis's age -- considered to be "of advanced age" based on her alleged disability onset date and at the time of filing her application and "closely approaching retirement age" by the date of her hearing -- the ALJ was required to consider Strangis's transferability of skills under 20 C.F.R. § 404.1568, which provides in pertinent part:

> Transferability of skills for persons of advanced age. If you are of advanced age (age 55 or older), and you have a severe impairment(s) that limits you to sedentary or light work, we will find that you cannot make an adjustment to other work unless you have skills that you can transfer to other skilled or semiskilled work (or you have recently completed education which provides for direct entry into skilled work) that you can do despite your impairment(s). We will decide if you have transferable skills as follows. . . . If you are closely approaching retirement age (age 60 or older) and you have a severe impairment(s) that limits you to no more than light work, we will find that you have skills that are transferable to skilled or semiskilled light work only if the light work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry. (See § 404.1567(b) and Rule 202.00(f) of appendix 2 to this subpart.)

20 C.F.R. § 404.1568(4). In other words, for the ALJ to conclude that Strangis is *not* disabled, he was required to find that she had transferrable skills. In order to make that finding, he in turn had to conclude that the light work she could perform now is "so similar" to her previous work to require "little, if any vocational adjustment," with respect to four categories: "tools, work processes, work settings, [and] the industry." *Id.*

During the hearing, as detailed above, the ALJ specifically asked the vocational

expert whether Strangis has transferrable skills. (AR 59.) In turn, the VE then asked questions of Strangis as to her use of an electronic device to manage inventory in her previous job as a food products service representative, her use of a computer more generally, and her ability to type. (AR 60-61.) The VE then testified that he believed there would be transferrable skills. (AR 61.) When asked about the "vocational adjustment needed to take these skills from the past work and transfer those to the sedentary information clerk job," the VE responded, "[w]ell it certainly would be a very different employment setting, that is absolutely the case." (AR 62.) Still, he concluded that the job adjustment would be "minimal," specifically pointing to her skills "interacting with customers in her past job." (AR 62-63.)

Relying on this exchange, plaintiff argues that the VE's testimony contains a conflict, which the ALJ was required but failed to resolve.[7] *See Terry v. Astrue*, 580 F.3d 471, 476 (7th Cir. 2009) (faulting an ALJ for failing to resolve a conflict in the opinions of the medical experts). In response, the Commissioner argues that the VE's testimony does not conflict because Strangis's prior work was "highly skilled" and the information clerk job was only "semi-skilled," and thus "less demanding." (Def.'s Opp'n (dkt. #19) 18.) This argument, however, does not address the VE's straight-forward statement that Strangis's prior job's employment setting -- one of the four categories to consider in

---

[7] Plaintiff also challenges whether these "skills" were properly classified as skills at all, directing the court to POMS DI 25015.017(C)(2), which distinguishes between skilled and unskilled tasks. (Pl.'s Opening Br. (dkt. #16) 13.) In response, the Commissioner points out that the VE did not rely on unskilled tasks like "answering a telephone and greeting customer," but instead focused on "more advanced customer service and computer expertise." (Def.'s Opp'n (dkt. #19) 19.) While this response appears adequate, Strangis may further explore the nature of her actual, transferrable skills on remand.

determining vocational adjustment -- was "very different."

As for the general office clerk position, plaintiff's argument is even stronger, though not because there was an inconsistency. The VE testified that the vocational adjustment would be "moderate," noting the client or customer service skills, but also that a general office clerk position would require "very basic office or clerical skills such as filing, perhaps entering data into a computer." (AR 63.) In his reply brief, the Commissioner effectively concedes that this job would not meet the requirement of 20 C.F.R. § 404.1568(4), because a "moderate" vocational adjustment is more than the "very little, if any," adjustment tolerated under that regulation.

Regardless of the particular merits of plaintiff's argument as to the general office clerk position, the court agrees that the VE testified that the job setting as for *both* positions were "very different" from her prior work, which conflicted with his conclusion that Strangis's skills were transferrable. As such, the court will reverse and remand based on that challenge.

## II. Consideration of Treating Health Care Providers

Next, plaintiff challenges the ALJ's treatment of the opinions of two of her health care providers, Nurse Practitioner Jacobs and Dr. Ingalls. As described above, NP Jacobs determined that Strangis could only work part-time, while Dr. Ingalls, in conjunction with Strangis's physical therapist, determined that she would need to lie down for one hour during an eight-hour day and that she would miss three to four days of work per month. The ALJ afforded both of these opinions only "partial weight," adopting other restrictions noted in their reports, while refusing to adopt these restrictions -- any one of which would

have rendered her disabled.

With respect to NP Jacobs, the ALJ discounted her opinion because: (1) she was not a "programmatically acceptable medical source"; and (2) on the day Jacobs offered her opinion, her examination of Strangis noted only pain and tenderness. With respect to Jacobs being a nurse practitioner rather than a physician, it is not clear whether the ALJ discounted her opinion on that basis or was simply acknowledging her status. The distinction is material since, as plaintiff correctly points out, "medical sources who are not 'acceptable medical sources,' such as nurse practitioners . . . are important and should be evaluated on key issues such as impairment severity and functional effects." *Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018) (quoting SSR 06-03P, 2006 WL 2329939 (Aug. 9, 2006)).) On this basis, plaintiff faults the ALJ for not weighing the "checklist of factors" that 20 C.F.R. § 404.1527(c) provides for evaluating the weight due medical opinions, including "the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *see also Phillips v. Astrue*, 413 F. App'x 878, 884 (7th Cir. 2010) (applying same factors to "other medical sources").

As the Commissioner points out, however, the ALJ need not "explicitly weigh" every factor. *Henke v. Astrue*, 498 F. App'x 636, 640 n.3 (7th Cir. 2012) (finding consideration of two factors sufficient). Here, other than noting that Jacobs is not a "programmatically acceptable medical source," the ALJ apparently only considered whether her opinion was consistent and, with respect to that factor, limited his analysis to Jacobs' treatment notes

from that day. Even then, the ALJ merely described Jacob's evaluation that day as "generally normal other than pain and tenderness." (AR 27.) It is not clear what other information the ALJ thought was lacking. More critically, the ALJ's summary of Jacob's treatment note is not accurate. In her treatment notes from that day, Jacobs actually found that Strangis is "having tightness in the back muscles, pain in the left buttock and bilateral groin pain. Pain with piriformis[8] both right and left. Left hip pain with some weakness due to the pain. Tenderness with palpation of the L3-5." (AR 484.) Moreover, this description appears consistent with the medical record as a whole -- specifically, the extensive physical therapy notes, the July 2014 MRI, and medical notes by specialists detailing her lower back pain -- as well as Jacobs' other examinations, albeit perhaps not as detailed as the November 2014 treatment note by Jacobs. While there may be valid reasons for not placing more than "partial weight" on Jacobs' opinion and specifically rejecting her opinion that Strangis could not work more than part-time, the ALJ's opinion lacks sufficient reasoning to form a logical bridge.

Strangis also faults the ALJ for his rejection of Dr. Ingalls' opinion that Strangis would need to lay down for an hour a day and would miss three to four days per month. "An ALJ who does not give controlling weight to the opinion of the claimant's treating physician must offer 'good reasons' for declining to do so." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)). Generally, the opinions of a claimant's treating physician are "give[n] more weight" because he or she is "likely to be

---

[8] "The piriformis (from Latin piriformis, meaning 'pear-shaped') is a muscle in the gluteal region of the lower limbs. It is one of the six muscles in the lateral rotator group." "Piriformis," Wikipedia, https://en.wikipedia.org/wiki/Piriformis_muscle.

the medical professional[] most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. § 404.1527(d)(2) (2011).

Here, the ALJ faults Dr. Ingalls for not providing "clinical correlation" or "data driven analysis," and notes that he saw "claimant only infrequently although he did sign off on Ms. Jacob[s'] notes." (AR 27.) Taking them out of order, even plaintiff acknowledges that Dr. Ingalls only saw her twice during the relevant period -- in May 2014 and September 2015 -- and on neither occasion does Dr. Ingalls note any significant discussion of her pain medication. Indeed, in May 2014, Strangis saw Ingalls for fever and chills; and in the September 2015 appointment, she simply asked him to complete a form, and he referred her to PT. As the ALJ also noted, Dr. Ingalls signed off on Jacobs' treatment notes, but that limited involvement does not materially strengthen Ingalls' position as a treating physician. The ALJ further faulted Ingalls for his failure to cite to data to support his opinion. While the court credits plaintiff's argument that Ingalls need not have included such reasoning on the form if not requested, his treatment notes similarly contain *no* indication that he examined her or otherwise assessed her back pain. Instead, he simply delegated the assessment to Strangis's physical therapist.[9]

In summary, the court agrees with plaintiff that the ALJ failed to provide an

---

[9] One could argue the ALJ should have considered that statement as an other medical source document and weighed it based on PT Formanek's extensive treatment of Strangis, but plaintiff does not make this argument.

adequate basis for discounting the opinion of N.P. Jacobs, although the court does not find error in his treatment of Dr. Ingalls. Still, on remand, plaintiff may certainly argue that a fair reading of Ingalls' opinions supports those of Jacobs'.

### III. Medical Support for Stand and Walk for Two Hours in Eight-Hour Day Finding

Next, Strangis faults the ALJ for failing to identify medical evidence to support his determination that Strangis could stand and walk for two hours in an eight-hour day. Specifically, plaintiff points out that the ALJ rejected Ingalls' opinion, which restricted Strangis to standing for a total of one hour in an eight-hour day and walking for less than a total of one hour in an eight-hour day, but placed great weight on the state agency medical consultants' opinions that she could stand and walk for a total of six hours in an eight-hour day. The actual RFC limitation adopted by the ALJ, however, fell between these two opinions, leaving an "evidentiary deficit that he was not permitted to fill with his own lay medical opinion." (Pl.'s Opening Br. (dkt. #16) 24 (citing *Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010) ("Even assuming that Dr. Orris's opinions did not deserve greater weight, it is the evidentiary deficit left by the ALJ's rejection of his reports—not the decision itself—that is troubling.")).)

In response, the Commissioner argues that the ALJ is not required to rely entirely on a particular physician's opinion and it is his responsibility, not a particular medical source, to craft the RFC. (Def.'s Opp'n (dkt. #19) 7-8.) Still, the ALJ must build a logical bridge in doing so. While this may not be an independent basis for remand, the court will instead direct the ALJ to explore and provide further explanation for this specific RFC limitation on remand.

## IV. Improper Discrediting of Strangis's Testimony

Finally, plaintiff raises several challenges to the ALJ's discrediting of her testimony about her limitations. In light of the discussion above and the other bases for remand, the court declines to walk through each of these challenges in great detail. The court notes, however, that a number of Strangis's challenges appear to have merit. In particular, while the ALJ expressly relied on isolated instances noted in the medical record where Strangis reported engaging in yard work or other more strenuous activity or attempting to work on a very limited basis, he completely failed to acknowledge that those same records also consistently note that she suffered increased pain during and following each episode.

The ALJ also faulted Strangis for her conservative approach to treatment and the fact that she had not had any surgery, other than to address her fractured ankle. Here, too, the ALJ failed to acknowledge Strangis' numerous appointments with specialists, including with surgeons, to explore more aggressive treatments, *and* that those doctors not only noted the risks and uncertainty associated with surgery, but advised *against it*. Thus, this is not a case where Strangis either ignored medical recommendations for surgery or failed to seek out treatment advice. Moreover, Strangis *did* try various injections and religiously attended roughly weekly physical therapy for almost a two-year period to address her ongoing pain issues.

Finally, the ALJ discounted Strangis' credibility based on her not taking prescription pain medication. Here, too, the ALJ failed to acknowledge Strangis trying opioids, including Tramadol and Hydrocodone, and Gabapentin, a drug to treat nerve pain, but opting not to take these because of the side effects. While the ALJ correctly pointed out

that two medical providers noted concern about Strangis having exaggerated her pain symptoms, which *is* a valid reason for discounting her opinion, both doctors also noted the objective medical evidence -- namely the 2014 MRI, CT scans, and x-rays -- confirmed significant loss of disk height.

Having found error with respect to Strangis's other grounds for reversal and remand, the court need not reach a final determination as to the ALJ's credibility determination, other than to require on remand that the ALJ address the apparent errors in accessing Strangis's credibility.

## ORDER

IT IS ORDERED that the decision of defendant Andrew Saul, Commissioner of Social Security, denying claimant Bernice Strangis's application for disability and disability insurance benefits is REVERSED AND REMANDED under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  The clerk of court is directed to enter judgment for plaintiff and close this case.

Entered this 30th day of September, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge